PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 23-1169

———————

In re: The Hertz Corporation, et al.,
Reorganized Debtors

Wells Fargo Bank, N.A., as Indenture Trustee

Appellant

v.

The Hertz Corporation; Dollar Rent A Car, Inc.; Dollar
Thrifty Automotive Group, Inc.; Donlen Corporation; DTG
Operations, Inc.; DTG Supply, LLC; Firefly Rent A Car
LLC; Hertz Car Sales LLC; Hertz Global Services
Corporation; Hertz Local Edition Corp.; Hertz Local Edition
Transporting, Inc.; Hertz System, Inc.; Hertz Technologies,
Inc.; Hertz Transporting, Inc.; Rental Car Group Company,
LLC; Smartz Vehicle Rental Corporation; Thrifty Car Sales,
Inc.; Thrifty, LLC; Thrifty Insurance Agency, Inc.; Thrifty
Rent A Car System, LLC; and TRAC Asia Pacific, Inc.

U.S. Bank National Association, as Indenture Trustee

v.

The Hertz Corporation

———————————————

Appeal from the United States Bankruptcy Court
for the District of Delaware
(No. 21-50995)
Bankruptcy Judge: Honorable Mary F. Walrath

———————————————

Argued on October 25, 2023

Before: KRAUSE, PORTER, and AMBRO, <u>Circuit Judges</u>

(Opinion filed September 10, 2024)

Donald Burke
John B. Goerlich
Wilkie Farr & Gallagher
1875 K Street, NW
Washington, DC  20006

Daniel Forman
Mark T. Stancil (**Argued)**
Rachel C. Strickland
Wilkie Farr & Gallagher
787 Seventh Avenue
New York, NY  10019

Matthew B. Lunn
Edmon L. Morton
Joseph M. Mulvihill
Young Conaway Stargatt & Taylor
1000 N. King Street
Rodney Square
Wilmington, DE 19801

   Counsel for Appellant Wells Fargo Bank, NA


Christopher Fong
Nixon Peabody
55 W. 46th Street
Tower 46
New York, NY 10036

Richard C. Pedone
Nixon Peabody
53 Exchange Place
Boston, MA 02109

Kevin S. Mann
Michael L. Vild
Cross & Simon
1105 N. Market Street
Suite 901, P.O. Box 1380
Wilmington, DE 19899

   Counsel for Appellee US Bank, NA

Paul D. Clement **(Argued)**
Mariel A. Brookins
C. Harker Rhodes, IV
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Aaron Colodny
White & Case
555 S. Flower Street
Suite 2700
Los Angeles, CA 90071

Thomas E. Lauria
White & Case
200 S. Biscayne Boulevard
Suite 4900
Miami, FL 33131

David M. Turetsky
White & Case
1221 Avenue of the Americas
New York, NY 10020

Jason N. Zakia
White & Case
111 S. Wacker Drive
Suite 5100
Chicago, IL 33130

Ricardo Palacio
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150, 8th Floor
Wilmington, DE 19899

        Counsel for Appellee Hertz Corp.

––––––––––––

OPINION OF THE COURT

––––––––––––

AMBRO, <u>Circuit Judge</u>

Bankruptcy is a lesson in leverage. It involves money and to whom it goes. The more advantage (leverage) a party has, the more it influences who gets paid. In a Chapter 11 case, the parties with more leverage control the reorganization, while those with less often must sit on the sidelines and await their fate. The debtors here, able to pay their creditors in full, believe they have the leverage to deny their unsecured noteholders more than a quarter billion dollars of interest they promised to pay pre-bankruptcy, all while giving lower priority equityholders four times that amount. Does the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*,[1] give the debtors enough leverage to do that?

––––––––––––

[1] Unless otherwise noted, citations to § <•> are to the Bankruptcy Code.

The debtors say so because of the Bankruptcy Code's general rule barring interest accruing post-petition (in bankruptcy lingo, "unmatured interest"). That is one way the Code deals with the difficult distributional problems of the typical case, where there is not enough money to go around. But this is not the typical case. At the end of the reorganization, the debtors here were so flush that they paid their former stockholders (the "Stockholders") roughly $1.1 billion. While the parties agree that the Code requires debtors to pay post-petition interest if they are solvent, they disagree whether this entitles creditors to post-petition interest at the federal judgment rate or the contract rate—a dispute with teeth, because the latter exceeds the former by more than 30 times in this case.

What happened here is that the Hertz Corporation and certain affiliates (collectively, "Hertz"), crippled by the COVID pandemic, filed for protection under Chapter 11 of the Bankruptcy Code in May 2020. To give a sense of its then-bleak prospects, Hertz warned in an SEC filing of "a significant risk that the [Stockholders] will receive no recovery under the Chapter 11 [c]ases and that our common stock will be worthless." Hertz Glob. Holdings, Inc., Prospectus Supplement (to Prospectus Dated June 12, 2019) S-4 (2020), https://perma.cc/9RJE-R6KT (June 15, 2020).

As the economy recovered, however, so did Hertz's financial prospects. It emerged from bankruptcy a year later via a confirmed plan of reorganization (the "Plan") that sold the company to a group of private equity funds. The Plan promised to leave all of Hertz's creditors unimpaired—in other words, it would not alter any of their rights. (Compare that to a normal bankruptcy plan, which typically discharges

creditors' claims for cents on the dollar.)  Therefore, none of Hertz's creditors could vote on the Plan; as a matter of law, they were all conclusively presumed to accept it.

To be precise, the Plan paid off Hertz's pre-petition debt, including unsecured bonds maturing biennially from 2022 to 2028 (the "Notes").  But the Plan did not pay holders of the Notes (the "Noteholders"[2]) contract rate interest for Hertz's time in bankruptcy.  Instead, it paid interest for that period at the much lower applicable federal judgment rate. Hertz also did not pay the Noteholders certain charges provided in the Notes, specifically, variable fees (calculated using financial formulas) designed to compensate lenders for their lost profits when a borrower pays them back ahead of schedule.  These fees are generically called make-wholes.  (To distinguish between make-wholes generally and the particular make-whole fees at issue here, we call the latter the "Applicable Premiums"—their title under those Notes.)  If Hertz had redeemed the Notes in mid-2021 without filing for Chapter 11, it would have owed the Noteholders the

---

[2] Wells Fargo Bank, National Association is nominally the appellant here, not the Noteholders.  It participates only in its capacity as indenture trustee under the Notes.  As the real parties in interest are the Noteholders, we instead refer to them in this opinion.

U.S. Bank National Association also appeals in its capacity as indenture trustee for other unsecured notes; its only issue is whether Hertz should have paid post-petition interest on its notes at their contract rate rather than the federal judgment rate. Beyond adopting the arguments made by the Noteholders, it did not offer any arguments of its own.

Applicable Premiums and contract rate interest, combined totaling more than $270 million. The savings effectively went to the Stockholders: The Plan gave them roughly four times that amount in a combination of cash and equity in the reorganized Hertz. The Noteholders, unsurprisingly, object to that result.

Among the issues we address are two questions of bankruptcy law unresolved in this Circuit: Does § 502(b)(2)'s prohibition on claims "for unmatured interest" cover make-whole fees like the Applicable Premiums, and does the Bankruptcy Code as a whole require solvent debtors to pay unimpaired creditors interest accruing post-petition at the contract rate?[3]

Hertz argues that make-whole fees are the economic equivalent of interest and must be disallowed under § 502(b)(2). It concedes, however, that the Bankruptcy Code requires solvent debtors to pay unimpaired creditors like the Noteholders post-petition interest, but, in its view, only at the federal judgment rate. So the company tells us the Noteholders received everything they were entitled under the Code.

---

[3] Throughout this opinion, we refer to contract rate interest. But we really mean the applicable non-bankruptcy rate, whatever it may be. *See, e.g., Ad Hoc Comm. of Holders of Trade Claims v. Pac. Gas & Elec. Co. (In re PG&E Corp.)*, 46 F.4th 1047, 1064 (9th Cir. 2022) (solvent debtor exception may require award of "contractual or state law default" interest). Hertz does not contest the Notes' validity under governing state law (New York)**,** hence our use of the contract rate here.

The Noteholders disagree. They claim the Applicable Premiums should not be disallowed as unmatured interest because they do not fit the dictionary definition of that term. In any event, they say that pre-Bankruptcy Code caselaw grants them an equitable right to payment in full (*i.e.*, both contract rate interest and the Applicable Premiums) because Hertz is solvent. So, since the confirmed Plan classified them as unimpaired, they must receive interest at the contract rate. Per the Noteholders, if we side with Hertz and cancel the otherwise enforceable fees and interest at issue, we will bless an outcome anathema to our law—a windfall to the Stockholders, who sit at the lowest rung of payment priority, by letting them "pocket[] hundreds of millions of dollars that Hertz had promised to [pay] the Noteholders" that it "could easily afford to repay . . . in full[.]" Noteholder Br. 1. They reject Hertz's view that we are addressing only subtleties of insolvency law and see this dispute as more fundamental.

We determine that the Applicable Premiums must be disallowed under § 502(b)(2), for they both fit the dictionary definition of interest and are its economic equivalent. But we agree with the Noteholders that they have a right to receive contract rate interest and the Applicable Premiums because Hertz was solvent. Thoughtful opinions issued by the Fifth and Ninth Circuits in quite similar cases support the Noteholders. *Ultra Petroleum Corp. v. Ad Hoc Comm. of Opco Unsecured Creditors (In re Ultra Petroleum Corp.)*, 51 F.4th 138 (5th Cir. 2022), *cert. denied*, 143 S.Ct. 2495 (2023); *Ad Hoc Comm. of Holders of Trade Claims v. Pac. Gas & Elec. Co. (In re PG&E Corp.)*, 46 F.4th 1047 (9th Cir. 2022), *cert. denied*, 143 S.Ct.

2492 (2023).[4]  We end as they do, though for us the primary support for that result is in absolute priority, "bankruptcy's most important and famous rule[.]"  *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017) (quoting Mark J. Roe & Frederick Tung, *Breaking Bankruptcy Priority: How Rent-Seeking Upends the Creditors' Bargain*, 99 Va. L. Rev. 1235, 1236 (2013)).  Allowing Hertz to cancel more than a quarter billion dollars of interest otherwise owed to the Noteholders, while distributing a massive gift to the Stockholders, would impermissibly "deviate from the basic priority rules . . . the Code establishes for final distributions of estate value in business bankruptcies." *Jevic*, 580 U.S. at 455.

## I. Background

## A. Procedural History

Hertz's Plan proposed to pay the Noteholders about $2.7 billion, reflecting the Notes' principal, contract rate interest that accrued before Hertz filed for bankruptcy, post-bankruptcy interest at the federal judgment rate (as applied in this case, 0.15% annually), and certain other fees.  It would not pay them post-petition interest at the contract rate or any fees for redeeming the Notes early, including the Applicable Premiums.  The Plan offered the Stockholders a package of

---

[4] The parties never cite the Second Circuit's ruling in *In re LATAM Airlines Group S.A.,* which also examined post-petition interest in solvent debtor cases.  55 F.4th 377 (2d Cir. 2022), *cert. denied*, 143 S.Ct. 2609 (2023).  In our view, that discussion was *dicta*, as the decision "affirm[ed] the Bankruptcy Court's finding that [the debtor] was insolvent." *Id.* at 389.

stock, warrants, and cash that it valued in the aggregate at around $1.1 billion.  App. 1514-15; Bankr. D.I. 4759 at 12, 18-19.[5]

Hertz and the Noteholders were aware of their disputes about contract rate interest and early redemption fees but did not let those issues delay emergence from Chapter 11.  Instead, the Plan designated the Noteholders unimpaired, reserved their right to litigate their disagreements post-confirmation, and committed to pay whatever was necessary to ensure they were unimpaired under the Plan.  The Noteholders were not allowed to vote on the Plan because, as unimpaired creditors, they were conclusively presumed to accept it.  § 1126(f).  The Plan was confirmed in early June 2021, and Hertz emerged from Chapter 11 later that month.

In July 2021, the Noteholders filed a complaint seeking payment of post-petition interest at the contract rate, the Applicable Premiums, and the flat fees for early redemptions found in the 2022 and 2024 Notes.  The Bankruptcy Court dismissed their claims for contract rate interest.  It concluded that, as unimpaired creditors of a solvent debtor, they were entitled to interest at the "legal rate," per §§ 1129(a)(7)(A)(ii) & 726(a)(5), and that rate is the federal judgment rate.  The Court rejected the Noteholders' argument that a "solvent debtor exception," following from pre-Bankruptcy Code

---

[5] Specifically, the Plan offered the Stockholders $1.53 in cash per share (with approximately 156 million shares outstanding, that was about $240 million), 3% of reorganized Hertz's equity (valued at $141 million), and warrants for further equity that the Plan estimated were worth $769 million.  Bankr. D.I. 4759 at 12, 18-19.

caselaw, required Hertz to pay them interest at the contract rate. It also dismissed their claims for flat redemption fees on the 2022 and 2024 Notes because those fees were not triggered as a matter of contract law. But over Hertz's objection, it concluded the opposite as to the Applicable Premiums. While Hertz also argued those Premiums were disallowed by § 502(b)(2)'s prohibition on claims for unmatured interest, the Bankruptcy Court did not then resolve that issue. Whether the claims were for interest for purposes of § 502(b)(2), it explained, was a "factual" question that required record development. App. 31.

After discovery, Hertz and the Noteholders cross-moved for summary judgment on that issue. Because the Bankruptcy Court concluded that the "economic substance" of the Applicable Premiums was interest, it disallowed the claims of the Noteholders. App. 73. They moved for reconsideration on post-petition interest in light of the intervening decisions in *Ultra* and *PG&E*, which both required solvent debtors to pay unimpaired creditors post-petition interest at the contract rate. The Bankruptcy Court did not change its mind: It had "considered all [the] arguments" on post-petition interest "and simply reached a different conclusion from that reached by the Fifth and Ninth Circuits." App. 77. It then *sua sponte* certified its decision for direct appeal to us. 28 U.S.C. § 158(d)(2). We agreed to review the appeal rather than requiring the parties to proceed first in the District Court.

The Noteholders ask us to reverse the Bankruptcy Court by ruling that Hertz owes them the fixed redemption fee on the 2024 Notes, the Bankruptcy Code does not prohibit payment of the Applicable Premiums, and (as unimpaired creditors of

the very solvent Hertz) they are entitled to post-petition interest at the contract rate.

### B. Jurisdiction, Standard of Review

We have jurisdiction under 28 U.S.C. § 158(d).  The Bankruptcy Court's rulings on Hertz's motion to dismiss and the cross-motions for summary judgment are both subject to our plenary review.  *In re Klaas*, 858 F.3d 820, 827 (3d Cir. 2017).

## II. Analysis

### A. The 2024 Notes' Fee

The Noteholders appeal the ruling that they were not entitled to an early redemption fee on the 2024 Notes.[6]  Those Notes required Hertz to pay a flat fee if they were redeemed "after October 15, 2019 and prior to maturity[.]"  App. 520. We agree with the Bankruptcy Court; this fee was not triggered because the 2024 Notes by their terms matured when Hertz filed bankruptcy and their redemption followed around a year later when it left Chapter 11.

True, the Bankruptcy Court's ruling allows Hertz to redeem the 2024 Notes well before 2024 without a fee.  But, viewed in the complex context of modern leveraged finance, that is not as "bizarre" a result as the Noteholders suggest.

---

[6] In their papers, the Noteholders concede that they are not owed an early redemption fee on the 2022 Notes.  Noteholder Br. 53 n.10.

Noteholder Br. 54.  Those Notes only mature early upon an acceleration approved by the lenders or a bankruptcy filing, which would not happen unless the lenders threatened to accelerate.  There is fierce debate whether borrowers should pay fees in that case, and both sides have valid points.[7]  So this result, likely stemming from extensive negotiations around the terms of the 2024 Notes as a whole, is not absurd.  That background illustrates why, given our limited familiarity with the intricacies of technical debt contracts, we should rule based on their terms alone, not our (perhaps uninformed) views of fairness.  *Cf. Cortland St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 198 (N.Y. 2018) (bonds must be enforced "according to the plain meaning of [their] terms" (citation omitted)).  What might appear fair to an unfamiliar court could be unfair when understood in full.

The Noteholders also argue that certain provisions of the 2024 Notes "refer to maturity arising 'on acceleration' or 'otherwise[,]'" so maturity here must mean the day they are

---

[7] *See* Matt Levine, *Bond Covenants and Skeptic Skepticism*, Bloomberg: Money Stuff (Jan. 12, 2017, 9:23 A.M.), https://www.bloomberg.com/opinion/articles/2017-01-12/bond-covenants-and-skeptic-skepticism; *compare* Adam Cohen, *The End of Covenants: The "No Premium on Default" Language Is Spreading Like Wildfire – Your Future Covenant Enforcement Is Being Destroyed*, Covenant Rev., (Jan. 11, 2017) (claiming borrowers will abuse creditors if bonds do not require early redemption fees upon default), *with* Steven A. Cohen et al., Wachtell, Lipton, Rosen & Katz, *Default Activism in the Debt Markets* (2018), https://perma.cc/82EL-PBJX (alleging that aggressive lenders are demanding early redemption premiums in response to technical defaults).

scheduled to mature in 2024.  Noteholder Br. 54.  We disagree.
The referenced sections of the 2024 Notes do not use the word
"maturity" but the defined term "Stated Maturity," which
means "the fixed date [here, October 15, 2024] on which the
payment of principal . . . is due[.]"  App. 404.  That is different
from maturity, which occurs whenever a debt obligation
"become[s] due."  *Mature*, Black's Law Dictionary (12th ed.
2024).  And, when interpreting contracts, we read defined and
undefined terms as having distinct meanings.  *See Derry Fin.
N.V. v. Christiana Cos., Inc.*, 797 F.2d 1210, 1214-15 (3d Cir.
1986); *see also Robertshaw US Holding Corp. v. Invesco
Senior Secured Mgmt. Inc. (In re Robertshaw US Holding
Corp)*, No. 24-90052, Adv. No. 24-03024, slip op. at 11-14
(Bankr. S.D.Tex. June 20, 2024) (deciding debt dispute on the
basis that "subsidiary" and "Subsidiary" have different
meanings in the same document).

In sum, Hertz never promised to pay the Noteholders a
fee in this situation.  Contract law does not bind parties to
promises they did not make.  If the commercially sophisticated
Noteholders think this outcome is unfair, they should not have
agreed to the terms of the 2024 Notes that compel it.  *Cf.
Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 434 (N.Y.
2013) ("[H]ad these sophisticated business entities . . . intended
[a different result], they easily could have included a provision
to that effect[.]" (citations omitted)).

## B. The Applicable Premiums

We turn to whether the Bankruptcy Court should have
allowed the Noteholders' claims for the Applicable Premiums,
which were triggered by Hertz's early payoff of the 2026 and
2028 Notes when it emerged from bankruptcy in 2021.

A bit of corporate finance knowledge is helpful here. Many bonds—including the 2026 and 2028 Notes—pay interest semi-annually via so-called coupons while outstanding. So, if a bond is redeemed before its scheduled maturity, lenders lose interest they otherwise would have received. In a compromise, many bonds—again, including the Notes—allow borrowers to redeem them before they are scheduled to mature in return for a flat fee. William J. Whelan III, *Bond Indentures and Bond Characteristics* in Leveraged Financial Markets: A Comprehensive Guide to High-Yield Bonds, Loans, and Other Instruments 171, 173 (William F. Maxwell & Mark R. Shenkman eds., 2010). It offers some compensation for lost interest income, but it does not attempt to be an exact substitute. We refer to this fee as the "Redemption Fee," and the first date when a borrower can redeem a bond by paying the Redemption Fee as the "Redemption Date." (The charge at issue for the 2024 Notes was a Redemption Fee.) But the 2026 Notes have a Redemption Date in August 2022 and the 2028 Notes' Redemption Date is in January 2023. Both Redemption Dates fall after Hertz's redemption of the Notes in June 2021—so, by contract, Hertz could not simply pay a Redemption Fee to rid itself of those Notes at that time.

However, there is another early release mechanism. Bonds sometimes allow borrowers to pay them off before the Redemption Date if lenders are "made whole," *i.e.*, if they receive the present value of the profits they would have booked in the alternate world where they were paid off on the Redemption Date. These make-whole fees guarantee lenders a minimum return, no matter how quickly a borrower pays them back. *See* Davis Polk & Wardwell LLP, *Creditor's Guide to Make-Whole Enforceability in Bankruptcy* 7 (2d ed.

2023), https://perma.cc/HZ2U-RL4F (a "make-whole provision ensures that creditors receive a minimum return on their investment . . . independent of when the debt instrument is repaid"); *In re Energy Future Holdings Corp. (EFH II)*, 842 F.3d 247, 250-51 (3d Cir. 2016) (make-wholes are "meant to give the lenders the interest yield they expect" in the event of an early redemption); *In re MPM Silicones, L.L.C.*, 874 F.3d 787, 801-02 (2d Cir. 2017) (make-wholes provide "additional compensation to make up for the interest [lenders] would not receive" if bonds are redeemed early).

As noted above, the Applicable Premiums are make-whole fees. While their language appears complicated,[8] their

---

[8] For readers interested in digging deeper, we offer the relevant text from the 2026 Bonds below (the 2028 Bonds are substantially identical).

> "Applicable Premium" means, with respect to a 2026 Note at any Redemption Date . . .[,] the excess of (A) the present value at such Redemption Date, calculated as of the date of the applicable redemption notice, of (1) the redemption price of such 2026 Note on August 1, 2022 (such redemption price being that described in Section 6(a)), plus (2) all required remaining scheduled interest payments due on such 2026 Note through such date (excluding accrued and unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (B) the principal amount of such 2026 Note on such Redemption Date . . . .

App. 662 (cleaned up).

substance is not.  The Premiums are made of three parts: interest coupons owed through the Redemption Date, the Redemption Fee, and a present value discount.[9]  They seek to ensure that Noteholders receive the return they expected for their investment in the Notes Hertz redeemed before their Redemption Date.

With that background, we can now consider the parties' positions.  Hertz argues that the Applicable Premiums must be

---

To clarify further, the Applicable Premiums can be calculated by summing (a) the present value of a redemption on the Redemption Date (*i.e.*, principal and Redemption Fee) and (b) the present value of unaccrued interest through the Redemption Date, and then subtracting (c) the Notes' undiscounted principal.  Ross Hallock, *The Math of Make-Wholes*, Covenant Rev., May 22, 2023, at 10.  Doing some math, the Applicable Premiums can be restated as (a) the present value of the Redemption Fee and unpaid interest minus (b) the present value discount applicable to the early payment of the Notes' principal.

[9] To redeem the Notes before their scheduled maturity, Hertz must also pay all accrued but unpaid interest.  App. 662.  (This is interest for the time the Notes have been outstanding since the last payment: for example, if Hertz paid interest on April 1 and redeemed the Notes on July 31, this would be interest from April through July.)  But because we require Hertz to pay post-petition contract rate interest, *infra* Section II.C, there will be no accrued but unpaid interest owing on the Notes after our decision.  Thus, we ignore that requirement in our discussion above.

disallowed under § 502(b)(2)'s explicit prohibition on claims for unmatured interest because that is exactly what they are. By contrast, the Noteholders say the Applicable Premiums are not interest at all. Before us, Hertz does not dispute the Bankruptcy Court's conclusion that it owes the Applicable Premiums under the terms of the relevant Notes. The Noteholders do not dispute that the Applicable Premiums did not accrue before Hertz's bankruptcy filing and therefore are unmatured as a matter of bankruptcy law. Whether the Applicable Premiums are interest is the issue here. The Bankruptcy Court, for its part, ruled that the Applicable Premiums were interest in "economic reality[.]" App. 73.

Because make-whole fees are common in bonds and can be quite large, Chapter 11 debtors and creditors have repeatedly and vigorously disputed whether they must be paid in bankruptcy. *See, e.g.*, *Ultra*, 51 F.4th at 144 (challenge to $201 million make-whole); *EFH II,* 842 F.3d at 252 ($431 million make-whole); *MPM*, 874 F.3d at 805 (nearly $200 million make-whole). Practitioners and academics have written extensively on the subject as well, including the issue here—whether make-whole fees must be disallowed under § 502(b)(2) as "unmatured interest[.]"[10]

---

[10] We found many articles on the subject helpful, including the pieces below (ordered by publication date): Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537 (2007); Patrick M. Birney, *Toward Understanding Make-Whole Premiums in Bankruptcy*, 24 Norton J. of Bankr. L. and Prac., no. 4, 2015; Bruce A. Markell, *"Shoot the . . .": Holes in Make Whole Premiums*, 36 Bankr. L. Letter, no. 5, 2016; Sam Lawand, *Make-Whole Claims in Bankruptcy*, 27 Norton J. of Bankr. L. and Prac., no.

There are two common approaches to this question. One suggests that the appropriate analysis is whether a make-whole fee best fits within dictionary and caselaw definitions of interest. *See, e.g.*, *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480-81 (Bankr. D. Del. 2011). The other approach, reflecting a concern that the definitional test puts form over substance, asks whether the make-whole at issue is the economic equivalent of interest. *Ultra*, 51 F.4th at 145-46 (warning the definitional approach is "susceptible to easy end-runs by canny creditors").

The Bankruptcy Court used the latter approach, concluded the Applicable Premiums are the economic equivalent of interest, and disallowed the Noteholders' claims. Hertz backs that rationale to us. The Noteholders primarily argue that the Applicable Premiums are not interest using the definitional approach, though they also disclaim any economic equivalency.[11]  To us, the Applicable Premiums are interest

---

4, 2018; Bruce A. Markell, *Dead Funds and Shipwrecks:* Ultra Petroleum, 39 Bankr. L. Letter, no. 4, 2019; Douglas G. Baird, *Making Sense of Make-Wholes*, 94. Am. Bankr. L.J. 567 (2020).

[11] The Noteholders also cite non-bankruptcy cases concluding that prepayment penalties are not interest. They particularly draw our attention to *Prudential Ins. Co. of Am. v. Comm'r of Internal Revenue*, 882 F.2d 832, 837 (3d Cir. 1989), where we "reject[ed the] position that prepayment charges are interest equivalents." Appealing language, but on further review the case is not relevant—the question was whether "prepayment charges upon the retirement of certain corporate mortgages should be characterized as long-term capital gain" or interest

under both approaches, though they must be disallowed under § 502(b)(2) if they fit under either. We handle each in turn.

The Noteholders' implicit definitional argument, boiled down, is that interest is a fee accruing while borrowed money is used. By contrast, the Applicable Premiums do not slowly and steadily accrue over the life of the Notes; they come into being fully formed upon an early redemption. In their words, the Applicable Premiums are "not compensation for Hertz's ongoing use of the Noteholders' money," one of their preferred definitions of interest, "but rather compensation for the termination of Hertz's obligations to the Noteholders[.]" Noteholder Br. 45 (emphasis omitted).

The problem with the Noteholders' definitional approach is that the definitions are broader than that. Look at their prime cases on the subject. *Deputy v. du Pont* defines interest as "compensation for the use or forbearance of money." 308 U.S. 488, 498 (1940). *Love v. State* marks it as "the cost of having the use of another person's money for a specified period[.]" 583 N.E.2d 1296, 1298 (N.Y. 1991) . Black's Law Dictionary says it is "[t]he compensation fixed by agreement or allowed by law for the use or detention of money,

---

for tax purposes. *Id.* at 833. As *Prudential* demonstrates, whether a prepayment charge is interest for purposes of another field of law does not automatically resolve the question for bankruptcy. Subject-specific considerations irrelevant in bankruptcy may have driven the analysis in those cases. And, in any event, many non-bankruptcy decisions agree with our broader view of interest. *See* Bruce A. Markell, *"Shoot the . . .": Holes in Make Whole Premiums*, 36 Bankr. L. Letter, no. 5, 2016 (citing cases).

or for the loss of money by one who is entitled to its use; esp[ecially] the amount owed to a lender in return for the use of borrowed money." *Interest*, Black's Law Dictionary (12th ed. 2024). *See* Bruce A. Markell, *"Shoot the . . .": Holes in Make Whole Premiums*, 36 Bankr. L. Letter, no. 5, 2016 (collecting definitions of interest and concluding that "payments which the lender collects for itself" above cash actually extended are interest).

These definitions of interest do not require that a charge accrue daily or be contingent on "ongoing" use of money. Contrary to the Noteholders' claims that the Applicable Premiums are not definitionally interest, they are "compensation" Hertz committed to pay (upon a contingency) in order to borrow (*i.e.*, use) the Noteholders' money. That the relevant contingency occurred—redemption of the Notes and the early return of the Noteholders' capital—does not change this conclusion. *Cf. Ultra*, 51 F.4th at 146 & n.8. To state it even from the Noteholders' perspective, the Applicable Premiums are among the suite of fees they extracted from Hertz in return for their credit. So Hertz's commitment to pay them was "compensation" for its use of their funds.[12]

---

[12] Supporting our conclusion, several decisions have held that original issue discount must be disallowed under § 502(b)(2) to the extent unmatured. *See, e.g.*, *In re Pengo Indus.*, 962 F.2d 543, 546 (5th Cir. 1992); *In re Chateaugay Corp.*, 961 F.2d 378, 380-81 (2d Cir. 1992). It is an amount tacked on to principal above the cash extended to a borrower. *Ultra*, 51 F.4th at 147 n.9. (For example, a loan with $100 of "principal" in return for an advance of $90 has $10 of original issue discount.) Like a make-whole, original issue discount is a large fee that does not accrue over time—rather, it is owing

The Noteholders also claim that the Applicable Premiums are definitionally not interest because they reflect the "reinvestment costs" that the Noteholders will suffer from redeploying their capital earlier than anticipated. Noteholder Br. 42. Presuming the Applicable Premiums perfectly match the Noteholders' reinvestment costs, we still conclude they must be disallowed under the definitional approach because a claim can simultaneously fit both the definition of interest and something else. *In re Dr.'s Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 706 (Bankr. N.D. Ill. 2014) (rejecting "false dichotomy" between describing a make-whole fee as liquidated damages or interest "because [it] may well be both"); *Ultra*, 51 F.4th at 148 ("interest labeled 'liquidated damages' is still interest" for § 502(b)(2) analysis). Interest by any other name does, in fact, smell as sweet. [13]

_____

(but not due) the day funds are extended. But courts rule that it is interest because it is "paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned." *Chateaugay*, 961 F.2d at 381.

[13] Without prejudging any case, we note that creditors are hard at work creating new forms of make-wholes that may also be interest by another name. *See, e.g.*, Elizabeth R. Tabas, *et al.*, *Equity-Like Sweeteners Go Mainstream*, Am. Bar Ass'n: Bus. L. Today (Oct. 12, 2023), https://perma.cc/E45H-T3ZE (discussing growth of multiple on invested capital and internal rate of return-based make-wholes instead of "traditional" make-wholes "expressly calculated by reference to future interest").

This case is a good example. The Noteholders describe their reinvestment costs as the losses they will suffer when "reinvest[ing] their prepaid principal in a less-advantageous market environment." Noteholder Br. 42. That is, the reinvestment costs are the unmatured interest the Noteholders will not recover in the market.

We also think the Applicable Premiums (which, to repeat, are composed of interest coupons owed through the Redemption Date, the Redemption Fee, and a present value discount) are the economic equivalent of interest. They are mathematically equivalent to the unmatured interest the Noteholders would have received had Hertz redeemed the Notes on their Redemption Dates. We take each component in turn.

The coupons that would come due before the Redemption Date are no doubt interest. Applying the logic we used above, the Redemption Fee is interest; it is a fee for the Noteholders' profit that Hertz agreed to as a condition for issuing the Notes. The Bankruptcy Court reached the same result, noting that the Redemption Fee is equal to "one semi-annual interest payment" on the Notes. App. 74. To the Noteholders, this is "entirely arbitrary" because a larger Redemption Fee without a superficial similarity to a coupon would survive under that logic. Noteholder Br. 50. But our conclusion that the Redemption Fee is interest—because it is a fee for the Noteholders' ultimate return that Hertz committed to pay in exchange for the right to use the Notes' principal—has nothing to do with its relationship to the Notes' annual interest rate: § 502(b)(2) would disallow unmatured Redemption Fees of $0.01 and $1 billion alike.

That leaves the significant present value discount (accounting for early payment of principal, coupons, and the Redemption Fee). Correctly adjusting for present value, however, does not defeat the mathematical identity. Because a "dollar today is worth more than a dollar tomorrow," *Ultra*, 51 F.4th at 148, discounts are applied to early payments to account for risk of default and the time value of money, thus making sure that lenders receive the benefit of their bargain— the value they would expect to receive through a scheduled, rather than premature, paydown. If early payments were not discounted, lenders would receive an unjustified windfall. In other words, accounting for present value makes the Applicable Premiums even more mathematically equivalent to the disallowed unmatured interest by correctly pegging its actual worth. Applying a present value discount is not sufficiently "transformative" to turn the sum of interest coupons and the Redemption Fee into something other than interest. *Id.*

In any event, a claim for less than all the unmatured interest owed by a debtor (like the Applicable Premiums, here discounted by present value) is still a claim for unmatured interest. Self-imposed discounts do not defeat § 502(b)(2).

To sum up, § 502(b)(2) disallows a claim for unmatured interest if it is either definitionally interest or its economic equivalent. Because the Applicable Premiums are both, the Bankruptcy Court correctly disallowed the Noteholders' claims for those Premiums.

## C. Solvent Debtors and Post-Petition Interest

Despite our holding above, does the Bankruptcy Code as a whole nonetheless require solvent debtors to pay unimpaired creditors interest accruing post-petition at the contract rate?  It is a technical question of bankruptcy law, and we give that issue its nuanced due below.  We can rephrase it in a way that makes the answer predictable: Can Hertz use the Bankruptcy Code to force the Noteholders to give up nine figures of contractually valid interest and spend that money on a massive dividend to the Stockholders?  The answer is no. As the Supreme Court told us more than a century ago, "the rule is well settled that stockholders are not entitled to any share . . . until all the debts of the corporation are paid."  *Chi., Rock Island & Pac. R.R. v. Howard*, 74 U.S. 392, 409-10 (1868).

We start, however, with the Fifth and Ninth Circuits' decisions on which the parties spend a significant portion of their briefs.  *Ultra* and *PG&E* are close analogues, each involving solvent debtors who sought to save immense amounts by paying unimpaired unsecured creditors post-petition interest at the federal judgment rate instead of the higher rates applicable outside bankruptcy.  In both cases, the creditors won.

The Fifth and Ninth Circuits took similar approaches to the issue.  Both Courts found in Supreme Court decisions a requirement to respect pre-Code practice absent a clear statement in the Bankruptcy Code, *Ultra*, 51 F.4th at 153-54; *PG&E*, 46 F.4th at 1057-58, concluded that pre-Code practice required solvent debtors pay contract rate interest, *Ultra*, 51 F.4th at 150-52; *PG&E*, 46 F.4th at 1053-55, and decided that the enacted Bankruptcy Code did not clearly reject that

tradition, *Ultra*, 51 F.4th at 154-56; *PG&E*, 46 F.4th at 1058-59.  They therefore ruled that the Code gives creditors of solvent debtors the equitable right to contract rate interest "before allocation of surplus value" to equityholders "absent compelling equitable considerations[.]"  *PG&E*, 46 F.4th at 1064 ; *Ultra*, 51 F.4th at 159-60.

The *PG&E* Court backstopped its decision with the Bankruptcy Code's logic of impairment.  46 F.4th at 1060-61.  "[I]mpaired" creditors—those whose bundle of "legal, equitable, and contractual rights" are "[]altered" by a bankruptcy plan—are entitled to a host of procedural protections.  Bankruptcy Code § 1124(1).  (The classic impaired creditor receives cents on the dollar for its claims.)  The Ninth Circuit thought limiting unimpaired creditors to interest at the federal judgment rate ran contrary to the Code's system of impairment; doing so would offer PG&E the best of both worlds by "pay[ing the relevant unimpaired creditors] the same, reduced interest rate as impaired creditors, while depriving them of the statutory protections that impaired creditors enjoy." *PG&E*, 46 F.4th at 1061.  The Court rejected this effort to let equity "have its cake and eat it too"; it could not let PG&E "reap[] a windfall of hundreds of millions of dollars" at creditors' expense while denying them both the statutory protections offered to impaired creditors and their equitable right to contract rate interest.  *Id.*

Hertz primarily challenges those decisions by suggesting they misread Supreme Court precedent.  Rather than require us to continue pre-Code practices absent a clear statement to the contrary, Hertz says the Supreme Court relegates historical bankruptcy law to a minor role; it is a mere "tool of construction" relevant only when the Code is

genuinely ambiguous.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 10 (2000).  Instead, the Circuits impermissibly used it as an "extratextual supplement[,]" *id.*, to require contract rate interest without reference to the Bankruptcy Code's actual text.

But we do not think those decisions disregard *Hartford* or the statutory text.  As the *PG&E* court correctly noted, pre-Code solvent debtor practice sprung from the pre-Code absolute priority rule.  46 F.4th at 1054.  And, as we explain below, the Bankruptcy Code adopted the pre-Code version of that rule.  So the common law absolute priority rule is not an "extratextual supplement" to the Bankruptcy Code.  It is an enacted part of it that we must respect.

What is that rule?  Our quote from *Chicago, Rock Island & Pacific* at the beginning of this section sums it up well: in bankruptcy, equity comes after debt (unless the latter consents).  The absolute priority rule serves as an essential governor on the bankruptcy process to protect creditors.  "Shareholders retain substantial control" over the debtor during Chapter 11, which gives them a "significant opportunity for self-enrichment at the expense of creditors."  *In re DBSD N. Am., Inc.*, 634 F.3d 79, 100 (2d Cir. 2011).  One of those opportunities comes from the debtor's functionally exclusive right[14] to propose the plan of reorganization that determines

---

[14] Debtors have the exclusive right to file a plan for the first 120 days of a case, a period that can be extended for up to 18 months. Bankruptcy Code §§ 1121(a) & (d).  They often obtain significant extensions of the exclusivity period.  Stephen G. Moyer, Distressed Debt Analysis: Strategies for Speculative Investments, 330 (2005) ("[B]ankruptcy courts usually will

creditors' ultimate treatment.  *Id.*; *see* Stephen G. Moyer, Distressed Debt Analysis: Strategies for Speculative Investments, 329-31 (2005) (Exclusivity is a "powerful weapon wielded by management in the battle with creditors[.]").  A "danger inherent in any reorganization plan proposed by a debtor" (including this Plan proposed by Hertz) is that it might "turn out to be too good a deal for the debtor's owners."  *Bank of Am. Nat'l Tr. and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999) (citing H.R. Rep. No. 93-137, pt. 1, at 225 (1973)); *DBSD*, 634 F.3d at 100 (noting that debtor's proposed plan offered its shareholder almost thirty times more value than "unsecured creditors . . . despite the latter's technical seniority").

History proves that to be a substantial risk.  Around the turn of the 20th century, American railroad owners used so-called "equity receiverships" to restructure otherwise untenable debts.[15]  A combination of pro-management receivers and bank-controlled "protective committees" gave a

---

have a predisposition toward allowing the debtor time to present a plan[.]"); Vincent S.J. Buccola, *Sponsor Control: A New Paradigm for Corporate Reorganization*, 90 U. Chi. L. Rev. 1, 9 (2023) (Bankruptcy courts often "grant[] managers serial extensions of the exclusivity period[.]").  Hertz had the exclusive right to propose a plan through the whole case.  Bankr. D.I. 3905 (extending exclusivity period through July 2021, more than a year after Hertz filed for bankruptcy).

[15] While the 1898 Bankruptcy Act was in force at that time, it only contemplated corporate liquidation.  Amendments in the 1930s added business reorganization procedures.  *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 448-49 (1940).

sliver of corporate insiders (including equity) near-complete control of the reorganization. William O. Douglas, *Protective Committees in Railroad Reorganizations*, 47 Harv. L. Rev. 565, 567-68 (1934); John D. Ayer, *Rethinking Absolute Priority After Ahlers*, 87 Mich. L. Rev. 963, 969-71 (1989). The result of these equity-controlled reorganizations was that outside creditors were wiped out, while insider equityholders retained control of a reinvigorated business.  Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 Stan. L. Rev. 69, 74-77 (1991) [hereinafter Markell, *Absolute Priority*]; David A. Skeel, Jr., Debt's Dominion: A History of Bankruptcy Law in America*, 56-69 (2001).

The Supreme Court unequivocally rejected those tactics, most prominently in *Northern Pacific Railway Co. v. Boyd*, 228 U.S. 482 (1913).  It ruled that creditors have "superior rights against the subordinate interests of . . . stockholders . . . . [Therefore,] [a]ny device . . . whereby stockholders [of an insolvent business] were preferred before the creditor [is] invalid."  *Id.* at 504.  *Boyd* is seen as announcing the absolute priority rule, which promptly "thereafter passed into the language and lore of the corporate lawyer."  Ayer, *supra*, at 973.[16]  Applied in bankruptcy, it

---

[16] But perhaps it was announced earlier. *See Chi., Rock Island & Pac. R.R.*, 74 U.S. at 409-10; *Louisville Tr. Co. v. Louisville, New Albany & Chi Ry. Co.*, 174 U.S. 674, 684 (1899) ("[T]he familiar rule [is] that the stockholder's interest in the [bankrupt company] is subordinate to the rights of creditors. . . . [A]ny arrangement of the parties by which the subordinate rights [are] secured at the expense of . . . creditors comes within judicial denunciation.").

prevents business owners, "the most junior claimants[,]" from recovering anything "unless creditors . . . are paid in full" or consent. Markell, *Absolute Priority*, *supra* at 72.

Today, the absolute priority rule is housed in § 1129(b). That section protects impaired creditors from overreaching plans. Unlike unimpaired creditors, whose rights are left unaltered and thus are "conclusively presumed" to accept a proposed plan, § 1126(f), impaired creditors may vote on it. A plan rejected by a class of impaired creditors can nonetheless be approved, but only if a court finds that it is "fair and equitable" to that class, with the burden on the plan proponent. § 1129(b); *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II.)*, 994 F.2d 1160, 1168-70 (5th Cir. 1993). That process is known as "cramdown." *See generally* Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L.J. 133 (1979) [hereinafter Klee, *Cram Down*].[17] In practical terms, that offers plan proponents a choice: "compensate creditors in full[,]" leaving them unimpaired, or confirm a plan paying them less (*i.e.*, impairing them) in the face of "the Code's substantive and procedural protections" for impaired creditors—including the ballot box and § 1129(b). *PG&E*, 46 F.4th at 1061.

With that throat-clearing complete, we turn to our case. The Plan promised to pay the Noteholders whatever amount was necessary to "render [them u]nimpaired" (*i.e.*, to leave

---

[17] In addition, a gateway requirement for a cramdown of an impaired rejecting class of creditors is that there be an acceptance of that plan by another class of impaired creditors. § 1129(a)(10).

their rights unaltered).    App 1512.    Hertz submits that the
"critical question . . . is [what interest rate] an unimpaired class
in a solvent debtor case is entitled to."  Tr. of Oral Arg. at 30.
But that "elides the antecedent question of what constitutes
unimpairment in the first place."  *PG&E*, 46 F.4th at 1062.[18]

A  creditor  is  impaired  if  its  treatment  violates  the
absolute  priority  rule  because  every  creditor  has  a  right  to
treatment consistent with that principle. This squarely follows
the Supreme Court's recent decision in *Czyzewski v. Jevic
Holding Corp.*, 580 U.S. 451 (2017).  There, a debtor sought
to pay friendly junior creditors while giving nothing to hostile
creditors with higher priority.  *Id.* at 459-60. It could not do so
via  a  plan,  because  this  distribution  would  violate  the
Bankruptcy Code's absolute priority rule. *Id.* at 460-61. So it
instead  obtained  an  order  from  the  Bankruptcy  Court
dismissing  the  case  and  distributing  the  cash  to  the  junior
creditors.  *Id.* at 461.   Our Court affirmed, reasoning that
"Congress codified the absolute priority rule . . . in the specific
context of plan confirmation . . . [,] and neither Congress nor
the  Supreme  Court  has  ever  said  that  the  rule  applies"  to
dismissals.    *Off.  Comm.  of  Unsecured  Creditors  v.  CIT*

---

[18] Hertz's  position  may  have  been  supported  by  former  §
1124(3), which declared creditors unimpaired if they received
"cash equal to . . . the allowed amount" of their claim.  But,
after a bankruptcy court used that section to deny post-petition
interest  to  an  unimpaired  creditor  in  a  solvent  debtor  case,
Congress promptly repealed it.  *In re PPI Enterprises (U.S.),
Inc.*, 324 F.3d 197, 205-06 (3d Cir. 2003) (discussing
legislative overruling of *In re New Valley Corp.*, 168 B.R. 73
(Bankr. D.N.J. 1994)).

*Grp./Bus. Credit, Inc. (In re Jevic Holding Corp)*, 787 F.3d 173, 183 (3d Cir. 2015) (citing § 1129(b)(2)).

The Supreme Court reversed.  Whereas our Court saw the absolute priority rule as a procedural protection that applied only when § 1129(b) is invoked (where the Code explicitly mentions it), the Supreme Court concluded it applied everywhere absent a clear statement authorizing a departure. *Jevic*, 580 U.S. at 465.  It "expect[ed] to see some affirmative indication of intent if Congress actually meant to [authorize] backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions that the Code prohibits[.]" *Id.*  "[S]imple statutory silence," the Court declared, is not enough to allow a "major departure" from the Code's basic principle.  *Id.*  In other words, the Bankruptcy Code entitles every creditor—not just the dissenting impaired creditors who can invoke § 1129(b)[19]—to treatment consistent with absolute priority absent a clear statement to the contrary.  *Id.*  That sounds like a right to us, at least for purposes of the Bankruptcy Code.[20]

---

[19] *Contra* App. 48 (Bankruptcy Court here announcing that the absolute priority rule is not relevant in this case because § 1129(b)(2) "on its face is not applicable to unimpaired creditors").  The Second Circuit concluded in *LATAM* that "the absolute priority rule comes into effect only when a class of impaired creditors votes to reject a plan[.]"  55 F.4th at 388 (citing *DBSD*, 634 F.3d at 105).  But the opinion never discusses the Supreme Court's decision in *Jevic*.

[20] The bundle of rights that impairment considers reflects adjustments required by the Bankruptcy Code.  *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d

This conclusion tracks the basic principles of impairment in bankruptcy. "Congress define[d] impairment in the broadest possible terms," *L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc.* (*In re L & J Anaheim Assocs.*), 995 F.2d 940, 942 (9th Cir. 1993) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 418 (7th Cir. 1984)), to ensure that creditors affected by a bankruptcy plan can vote on it. *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 203 (3d Cir. 2003). If receiving payment in full a few months after confirmation renders a creditor impaired under § 1124(1), *W. Real Est. Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 243-46 (5th Cir. 2013), it must be the case that a creditor faced with a plan denying it bankruptcy's fundamental protection (in the Noteholders' case, to the tune of hundreds of millions of dollars) is affected enough to be impaired under that subsection.[21]

---

197, 204 (3d Cir. 2003). Contrary to the Noteholders' argument, this means that disallowance by § 502(b)(2) does not result in impairment. *Id.*; *Ultra Petroleum Corp. v. Ad Hoc Comm. of Unsecured Creditors of Ultra Res. (In re Ultra Petroleum Corp.)*, 943 F.3d 758, 763-64 (5th Cir. 2019); *PG&E.*, 46 F.4th at 1063 n.11; *LATAM*, 55 F.4th at 384-85. That is not to say that a creditor is impaired without the benefit of a procedural protection offered by the Code—the language of *Jevic* compels that conclusion as to the absolute priority rule.

[21] While not briefed by the parties, we note the effective consequence of classifying the Noteholders impaired. They would have been the sole impaired class of creditors under the Plan**,** and so would have had the veto power awarded by § 1129(a)(10). Without their consent, Hertz could not confirm

That result also flows from *Jevic*'s condemnation of "backdoor means" to defeat the absolute priority rule. 580 U.S. at 465. The Bankruptcy Code offers a creditor consent at the ballot box as a "front door" to confirm a plan that violates absolute priority. § 1129(a)(8); Markell, *Absolute Priority*, *supra* at 88-89. Concluding that absolute priority is a right that must be respected in the § 1124(1) analysis directs noncompliant plans through the front door, as *Jevic* intended. Ruling as Hertz requests, by contrast, leaves the back door wide open in solvent debtor cases like this one and gives plan proponents the unintended power to force creditors to accept a "priority-violating" distribution. *Jevic*, 580 U.S. at 465; *cf. PG&E*, 46 F.4th at 1061 (rejecting "a reading of the Code that permits . . . end-run[s]" around creditor protections to benefit equity). Creditors could be compelled to accept—without even the chance to vote or explicit statutory authorization—treatment that falls so short of the Code's basic guarantees that it could not be "crammed down" on them if they rejected it at the polls. § 1129(b); *Off. Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 677-80 (6th Cir. 2006). That theory also lacks explicit statutory support and is therefore contrary to *Jevic*.

Accordingly, the Noteholders' right to treatment consistent with absolute priority must be honored to leave them unimpaired. Hertz still maintains that any such right does not require post-petition interest at the contract rate. In its view, we cannot rule based on the principle announced in *Boyd*—that equity cannot recover until debt is paid in full—because the

---

the Plan. It seems plausible to think the Noteholders would not have accepted a penny less than their contractual entitlement.

Code's treatment of absolute priority lists "very specific principles about . . . priorities," and that list is silent on post-petition interest. Tr. of Oral Arg. at 47. It argues there is a "common law absolute priority rule," *id.*, following *Boyd* and its progeny, and a separate absolute priority rule enumerated in the Code that we are bound to follow. § 1129(b)(2). But we reject this view because no such dichotomy exists. In fact, the Bankruptcy Code incorporates the common law absolute priority rule articulated in *Boyd*.

As noted above, a plan satisfies the enacted absolute priority rule only if it is "fair and equitable." § 1129(b). "Congress chose [those] words with care. . . . [They] stand proxy for over a century of judicial decision-making, and over half a century of legislative guidance." *Collier on Bankruptcy* ¶ 1129.03[4] (16th ed. 2024). That is not just the commentary of a well-regarded treatise; it is supported by legislative history. Markell, *Absolute Priority, supra*, at 88-89 & n.134; Klee, *Cram Down*, *supra* at 142. And, much more importantly, it tracks the language of the statute.

When interpreting "fair and equitable" in the Bankruptcy Act (the Code's immediate predecessor), the Supreme Court concluded that those words incorporated the common law absolute priority rule. *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 118-19 (1939) (fair and equitable is a "term of art" that includes *Boyd* and its progeny); Markell, *Absolute Priority, supra* at 85 & nn.102-04. Congress very deliberately included those exact words in the Bankruptcy Code. And the Supreme Court is clear: When Congress imports into a statute a "judicially created concept," it takes that concept whole unless it makes its contrary "intent specific," a rule "followed . . . with particular care in

construing" the Bankruptcy Code.  *Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 501 (1986).  We thus see Congress's choice to reuse "fair and equitable" as deliberately incorporating the common law absolute priority rule into the enacted Bankruptcy Code.

Further support comes from the precise language of § 1129(b)(2), which notes that the fair and equitable test "includes" certain enumerated requirements.  But that does not reflect an intent to limit absolute priority to just the listed conditions: "Includes" in the Bankruptcy Code is "not limiting." § 102(3).  So a plan is not automatically fair and equitable under the Bankruptcy Code merely because it complies with the requirements in that section.  *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 (5th Cir. 1989) (citing *In re D & F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989)); *Collier on Bankruptcy* ¶ 1129.03[4][b][ii] (16th ed. 2024); Kenneth N. Klee, *Cram Down II*, 64 Am. Bankr. L.J. 229, 229-31 (1990).  The use of "includes" suggests that the full meaning of fair and equitable is located elsewhere; as explained above, it is found in pre-Code absolute priority caselaw and practice.[22]

That jurisprudence required solvent debtors to pay contract rate interest before making distributions to equity. *See, e.g.*, *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 527-28 (1941) (citing absolute priority cases, including

---

[22] The Second Circuit disagreed in *LATAM*, 55 F.4th at 388-89 (concluding that the absolute priority rule's requirements are fully codified in § 1129(b)(2)).  But *LATAM* does not address the specific language of the Code, which controls our analysis here.

*Boyd*);[23] *see generally PG&E*, 46 F.4th at 1054 (pre-Code solvent debtor jurisprudence flowed from "[t]he common-law absolute priority rule"); Chaim J. Fortgang & Lawrence P. King, *The 1978 Bankruptcy Code: Some Wrong Policy Decisions*, 56 N.Y.U. L. Rev. 1148, 1159 (1981) (the Bankruptcy Act's absolute priority rule required "post-petition interest . . . at the full, contractually agreed-upon rate" before equityholders could recover). Reviewing "three centuries of bankruptcy law," the *Ultra* Court saw a simple rule: "When a debtor can pay its creditors interest on its unpaid obligations in keeping with the valid terms of their contract, it must." 51 F.4th at 150.

That makes sense. To repeat, the absolute priority rule requires creditors' obligations be paid in full before owners, with junior rights to the business, take anything at all. So it should be no surprise that several thoughtful decisions conclude that the Bankruptcy Code's absolute priority rule, which incorporates common law and Bankruptcy Act jurisprudence, can require payment of contract rate interest in solvent debtor cases. *Dow Corning*, 456 F.3d at 678-80; *In re Energy Future Holdings Corp. (EFH I)*, 540 B.R. 109, 117-18 (Bankr. D. Del. 2015); *In re Mullins*, 633 B.R. 1, 10-16 (Bankr.

---

[23] The Bankruptcy Court's opinion suggests *Consolidated Rock* is inapplicable here because the creditors in that case had collateral for their claims, unlike the Noteholders. App. 46-47. But the logic of *Consolidated Rock* does not focus on the security held by the lenders; rather, it emphasizes the amounts the junior stockholders will recover. 312 U.S. at 527 (noting that the "plan does not satisfy the fixed principle of the *Boyd* case").

D. Mass. 2021); *cf. PG&E*, 46 F.4th at 1060-61.  We join their reasoning.

But while the absolute priority rule can require payment of contract interest in solvent debtor cases, it does not always do so.  Rather, it imposes the equitable rate of post-petition interest, whatever that may be.  *See, e.g.*, *Dow Corning*, 456 F.3d at 678-80; *EFH I*, 540 B.R at 117-18.  This equitable concern is not for former owners.  Rather, courts primarily worry that paying one creditor contract rate interest might give it an inequitable leg up over its peers if there is not enough to pay everyone their full rate.  *See, e.g.*, *PG&E*, 46 F.4th at 1064.  The ordinary course, with which we generally agree, thus would be to remand to the Bankruptcy Court and ask it to determine whether any "compelling equitable considerations" counsel against awarding the Noteholders their contract rate.  *Id.* (citations omitted).

For two reasons, however, we do not do so here.  The first is procedural: Hertz never suggested we remand to the Bankruptcy Court rather than award the Noteholders their requested interest.  Our forfeiture doctrine counsels against rewarding that choice.  *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 146-48 (3d Cir. 2017).

The second is equitable.  In the normal case, the equitable rate of post-petition interest will be determined before plan confirmation—*i.e.*, before the money goes out the door.  But here, the Stockholders received $1.1 billion in value from Hertz when the Plan went effective more than three years ago.  No party suggests we can unscramble that egg.  So our equitable calculus must reflect that the Stockholders already took their dividend.  Therefore, the equities demand the

Noteholders recover post-petition interest at the contract rate. It would be profoundly unfair to scrimp on the Noteholders' interest when the junior Stockholders already received a billion dollar distribution. To be clear, the post-petition interest we award includes the Applicable Premiums, which Hertz persuaded us were contractual interest accruing after the bankruptcy filing. *Supra II.B*; *Ultra*, 51 F.4th at 160 ("[T]he traditional solvent-debtor exception compels payment of the Make-Whole Amount[.]"); *cf. Dow Corning*, 456 F.3d at 680 ("[T]here is a presumption that default interest should be paid to unsecured claim holders in a solvent debtor case.").

Our result is supported by the requirement that we interpret the Bankruptcy Code "holistic[ally.]" *United Sav. Ass'n of Tex. v Timbers of Inwood Forest Assoc's,* 484 U.S. 365, 371 (1988). We do so with an eye to "produc[ing] a substantive effect that is compatible with the" Code. *Id.* Hertz's theory that the Noteholders should not recover contract rate interest creates significant tensions with the Code's basic structure. We briefly note two of them. First, when a plan sticks only one class of creditors with losses, it cannot be confirmed over their objection. § 1129(a)(10). That "critical confirmation requirement[]" prevents "abuse of creditors" by ensuring that plan proponents cannot force one unlucky class to bear the entire brunt of the bankruptcy against its will. *John Hancock Mut. Life Ins. Co v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993). Hertz's proposed result would do just that by forcing the Noteholders alone to sacrifice over their vigorous dissent. Concluding they are impaired by payment of interest at the federal judgment rate makes (a)(10) effective in this case by protecting them from a plan that, at their expense alone, pays everyone else. Second, impaired rejecting creditors of solvent debtors may receive contract rate

interest through the absolute priority rule. *Dow Corning*, 456 F.3d at 678-680.[24]   But, under Hertz's rule, unimpaired creditors like the Noteholders would receive only the federal judgment rate.  In effect, they would recover significantly less than is fair and equitable (and so less than objecting impaired creditors must receive).  And "creditors who are *unimpaired* . . . cannot be treated any worse than *impaired* creditors, who at least get to vote[.]"   *Ultra*, 51 F.4th at 158 (emphases in original); *PG&E*, 46 F.4th at 1060-61; *EFH I*, 540 B.R. at 123.

Our colleague dissenting in part believes that we offer short shrift to § 502(b)(2), which "plainly disallows" post-petition interest in any form.  Partial Dissent 1.  Not so.  Even Hertz agrees that "[u]nsecured creditors may indeed receive post-petition interest *on* their allowed claims" in a solvent debtor case like this one.  Hertz Br. 30 (emphasis in original).  That concession "forecloses the notion that § 502(b)(2) alone limits unimpaired creditors' ability to collect post[-]petition interest," *PG&E*, 46 F.4th at 1059.  This must be the case because "reading . . . § 502(b)(2) to disallow *all* post-petition interest, whether as *part of* a claim or *on* a claim, would plainly conflict with § 1129(a)(7)(A)(ii) and § 726(a)(5), which expressly operate to *allow* post-petition interest *on* claims." *Ultra*, 51 F.4th at 159 n.27 (emphases in original)*; see also EFH I*, 540 B.R. at 111 ("[T]here is a distinction between the payment of interest *on an allowed claim* as opposed to *as an*

---

[24] *Contra* App. 53 (Bankruptcy Court stating that "[i]f the Noteholders had been treated as impaired and [rejected] the Plan, they would have received . . . post-petition interest in accordance with sections 1129(a)(7) and 726(a)(5)[,]" which the Bankruptcy Court concluded awarded interest only at the federal judgment rate).

*allowed claim*. . . .  The claim itself does not change.  What may change is what the holder of a claim is entitled to receive under a confirmed plan.") (emphases in original); *In re Dow Corning Corp.*, 244 B.R. 678, 685 (Bankr. E.D. Mich. 1999) ("[S]ince § 502(b)(2) speaks only to claim *allowance* . . ., [it] does not rule out the possibility of interest *on* allowed claims pursuant to § 1129(b).") (emphasis in original); *Mullins*, 633 B.R. at 15.

### III.  Conclusion

The Noteholders loaned Hertz billions and received back a contractually valid promise to pay fees and interest.  The COVID pandemic resulted in a liquidity crisis and a Chapter 11 filing.  Bankruptcy gave the then-insolvent Hertz, among other things, the opportunity to disallow claims for interest not yet mature at its filing.  But the pandemic's vice eased and the bounceback to Hertz's business made it so financially strong at confirmation of its Plan a year later that Hertz concedes it must pay post-petition interest on the Noteholders' allowed claims.  But at what rate?  Two holdings in similar circuit court cases say it is the rate imposed by the relevant nonbankruptcy law.  We agree and expand further on our primary reasoning for that result.

With more than a quarter billion dollars at stake, it is no shock that Hertz looked to maximize its leverage over the Noteholders rather than simply giving in.  Its argument was creative and reflects a deep familiarity with the details of the Bankruptcy Code.  But it misses the bigger picture.  The Code does not award leverage arbitrarily.  Rather, it assigns leverage in ways that ensure the "plan will achieve a result consistent

with the objectives and purposes of the . . . Code." *Madison Hotel*, 749 F.2d at 425 (internal quotation marks omitted).

And there is no question that Hertz's proposal—paying the Noteholders a fraction of the interest they were contractually promised, while distributing more than a billion dollars to the Shareholders—is contrary to those objectives and purposes. Once again, "the familiar rule [is] that the stockholder's interest in the [bankrupt company] is subordinate to the rights of creditors. . . . [A]ny arrangement of the parties by which the subordinate rights . . . [are] secured at the expense of . . . creditors comes within judicial denunciation." *Louisville Tr. Co. v. Louisville, New Albany & Chi. Ry. Co.*, 174 U.S. 674, 684 (1899). The accretional array of cases, topped by *Jevic*, carries this "fixed principle," *Boyd*, 228 U.S. at 507, through to today. Marbled in the Bankruptcy Code, it disfavors nonconsensual distributions to equity over creditors.

So it should be no surprise in this solvent debtor case that Hertz's strategic maneuvering comes to naught. The Code's careful design does not give Hertz enough leverage to subvert that law's foundational goals. We thus affirm in part and reverse in part the Bankruptcy Court's decisions. To comply with the absolute priority rule, and thus fulfill the Plan's promise to "leave[] unaltered the [Noteholders'] legal, equitable, and contractual rights[,]" § 1124(1), Hertz must pay the post-petition interest at the Notes' applicable contract rate, including the Applicable Premiums on the 2026 and 2028 Notes.

PORTER, *Circuit Judge*, concurring in part and dissenting in part.

I join the majority's opinion except for Part II.C, which holds that Hertz must pay the Applicable Premiums and post-petition contract-rate interest to the Noteholders. The Fifth and Ninth Circuits have reached the same result as the majority. *See Ultra Petroleum Corp. v. Ad Hoc Comm. of Opco Unsecured Creditors (In re Ultra Petroleum Corp.)*, 51 F.4th 138 (5th Cir. 2022); *Ad Hoc Comm. of Holders of Trade Claims v. Pac. Gas & Elec. Co. (In re PG&E Corp.)*, 46 F.4th 1047 (9th Cir. 2022). But I largely agree with the dissents in those cases, which recognize that the Bankruptcy Code plainly disallows claims "for unmatured interest" like the Noteholders' claims for the Applicable Premiums and post-petition interest. 11 U.S.C. § 502(b)(2); *see Ultra*, 51 F.4th at 160–64 (Oldham, J., dissenting); *PG&E*, 46 F.4th at 1065–75 (Ikuta, J., dissenting). To the extent that the majority's reasoning tracks that of the Fifth and Ninth Circuits, I have little to add to those thoughtful dissents. But to the extent that it differs, I write separately.

I

The majority's core argument concerns 11 U.S.C. § 1124, which governs when "a class of claims or interests is impaired under a plan." A class of claims is unimpaired if, "with respect to each claim or interest of such class, the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." *Id.* § 1124(1). Hertz's Plan promised to pay the Noteholders' claims "in the amount necessary to render them unimpaired." J.A. 12.

To honor that promise, the majority concludes that Hertz must pay contract-rate interest. That is because,

according to the majority, one of the "rights" protected under § 1124(1) is treatment consistent with bankruptcy law's "absolute priority rule." Roughly speaking, the absolute priority rule requires creditors to be paid in full before equityholders receive a penny. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464–65 (2017) (explaining the rule and describing it as "fundamental to the Bankruptcy Code's operation"). Because Hertz has paid over $1 billion to its former equityholders, the majority believes that Hertz must pay its creditors' claims in full to render them unimpaired, including the Applicable Premiums and post-petition interest to which the Noteholders are contractually entitled.

I disagree with the majority for two reasons. First, treatment consistent with the absolute priority rule is not one of the "rights" protected under § 1124(1). Impairment does not depend on whether the Plan alters *any* of the Noteholders' "legal, equitable, and contractual rights," regardless of the legal source from which the right springs. *Id.* It depends on whether the Plan alters the "rights to which" the Noteholders' *claims* "entitle[]" the Noteholders. *Id.* Here, the rights to which the Noteholders' claims entitle them do not include the right to treatment consistent with absolute priority. *See PG&E*, 46 F.4th at 1073 (Ikuta, J., dissenting) ("[T]he language of § 1124(1) . . . explains only when a *claim* is impaired" and "does not [otherwise] describe when a *holder's* equitable rights have been impaired[.]"). The Code defines a "claim" as any "right to payment" and any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5). These are the "rights to which" a claim "entitles [its] holder," *id.* § 1124(1), and they may include "equitable rights such as restitution" and "quantum meruit," *see PG&E*, 46 F.4th at 1074 (Ikuta, J., dissenting). But the Noteholders' right to treatment consistent with absolute

2

priority is a "procedural protection," Maj. Op. 33, not a substantive "right to payment" or "right to an equitable remedy for breach of performance," § 101(5). Assuming that the absolute-priority right exists, it flows from a legal source other than the Noteholders' claims—like pre-Code practice, the Code itself, or background principles of bankruptcy law—and therefore is irrelevant to impairment under § 1124(1). *See* Maj. Op. 33 (stating that "the Bankruptcy Code," not claims themselves, "entitles every creditor . . . to treatment consistent with absolute priority").[1]

---

[1] Interestingly, Hertz believes that it must pay post-petition interest *on* the Noteholders' claims at the federal judgment rate to render them unimpaired. This view rests in part on the premise that § 502(b)(2) disallows post-petition interest as part of a claim but does not affect post-petition interest accruing on an allowed claim. *See, e.g.*, *Ultra*, 51 F.4th at 159 n.27. However, I see "no [textual] basis for the . . . interpretation of § 502(b)(2) as prohibiting interest *as part of* an allowed claim but not prohibiting interest *on* a claim once it is allowed." *PG&E*, 46 F.4th at 1067 (Ikuta, J., dissenting). While some other provisions in the Code provide for post-petition interest on allowed claims, 11 U.S.C. § 726(a)(5), I tend to view such provisions as "exceptions to [a] general rule disallowing post-petition interest," *PG&E*, 46 F.4th at 1067 (Ikuta, J., dissenting), not as evidence that § 502(b)(2) does not generally apply to post-petition interest on allowed claims. In any event, we need not decide whether Hertz could have paid no post-petition interest whatsoever without impairing the Noteholders' claims. Hertz paid post-petition interest at the federal judgment rate to the Noteholders and does not ask the Noteholders to return that amount. Following the principle of party presentation, I would "rely on the parties to frame the issues for decision" and hold only that

Second, even if § 1124(1) implies the Noteholders' right to treatment consistent with absolute priority, the Noteholders' claims are nevertheless unimpaired because it is the Code that alters the Noteholders' right, not the Plan. *See Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 204 (3d Cir. 2003) ("[A] creditor's claim outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on . . . rights."). It is the Code, not the Plan, that disallows the Noteholders' claims for the Applicable Premiums and post-petition contract-rate interest, § 502(b)(2), resulting in treatment that the majority deems inconsistent with absolute priority.

## II

In making the argument discussed in the previous section, the majority relies on *Jevic* to support the proposition that treatment consistent with absolute priority is "a right . . . for purposes of the Bankruptcy Code." Maj. Op. 33. But the majority separately appears to rely on *Jevic* for an argument that does not depend on impairment under § 1124(1). My colleagues describe the *Jevic* Court as "conclud[ing]" that absolute priority "applie[s] everywhere absent a clear statement authorizing a departure." Maj. Op. 33. Under this view, Hertz might be required to pay contract-rate interest because the Code does not clearly state that absolute priority should be violated here, regardless of whether the Noteholders' claims are impaired under § 1124(1).

*Jevic* dealt with a bankruptcy court's power to dismiss a case under 11 U.S.C. § 1112(b). Ordinarily, a dismissal results in a restoration of the pre-petition status quo, "revest[ing]

---

Hertz need not pay more than it has already paid. *Greenlaw v. United States*, 554 U.S. 237, 243 (2008).

the property of the estate in the entity in which such property was vested immediately before the commencement of the case." *Id.* § 349(b)(3). But the Code permits a bankruptcy court, "for cause," to "order[] otherwise," *id.* § 349(b), in a so-called "structured dismissal." The bankruptcy court in *Jevic* ordered a structured dismissal "that gave money to high-priority secured creditors and to low-priority general unsecured creditors but which skipped certain dissenting mid-priority creditors." 580 U.S. at 454. This dismissal violated the absolute priority rule as codified for Chapter 7 liquidations and Chapter 11 plans because it compensated low-priority creditors before mid-priority creditors received anything on their $8.3 million claim. *Id.* at 460; *see* 11 U.S.C. §§ 725, 726, 1129.

The Supreme Court held that the bankruptcy court lacked the power to order such a dismissal. *Jevic*, 580 U.S. at 464. As the majority emphasizes, the Court noted "[t]he importance of the priority system," which requires "more than simple statutory silence if, and when, Congress were to intend a major departure." *Id.* at 465. But the Court did not rest its decision on that reasoning alone, proceeding to observe that there is scant basis for "priority-violating" structured dismissals in the Code. *Id.* The Code's baseline is for dismissals to return the parties to the pre-petition status quo, which does not violate absolute priority. *Id.* at 466. Deviations from this baseline are permitted only "for cause." § 349(b). The Court considered "cause" to be "to weak a reed upon which to rest [a] weighty . . . power" like a priority-violating dismissal. *Jevic*, 580 U.S. at 466. It reached this conclusion because of the meaning of "cause" in context, which "appears designed to give courts the flexibility to make the appropriate orders to protect rights acquired in reliance on the bankruptcy case," not to "make general end-of-case distributions of estate assets" that

violate priority. *Id.* (internal quotation marks and quoted source omitted).

I disagree that *Jevic* requires Hertz to pay contract-rate interest for at least two reasons. First, the posture of this case is distinguishable from that of *Jevic*. There, the bankruptcy court exercised a power without any express basis in the Code, thereby violating absolute priority, so the Supreme Court concluded that the bankruptcy court was not so empowered. *Jevic*, 580 U.S. at 464–67. Here, the Code expressly *disempowers* courts from allowing claims for post-petition contract-rate interest over an objection. § 502(b)(2). The majority concludes that because this disempowerment violates absolute priority, we may disregard it and wield power that the Code expressly withholds from us. I find no support for that conclusion in *Jevic*, where the bankruptcy court was not expressly empowered to violate absolute priority.

Second, even if the majority is correct that Hertz violates the common law absolute priority rule, Hertz's violation differs significantly from the violation in *Jevic*. There, the structured dismissal violated the *codified* absolute priority rules for Chapter 7 liquidations and Chapter 11 plans, insofar as low-priority creditors were paid something but some mid-priority creditors were paid nothing. *Jevic*, 580 U.S. at 460. Here, Hertz has not violated the codified absolute priority rules because it has paid the Noteholders' allowed claims in full. For both Chapter 7 liquidations and Chapter 11 plans, codified absolute priority requires payment of allowed claims, not payment of disallowed contractual entitlements. *See, e.g.*, § 726(a)(3) (giving third priority to "payment of any *allowed* unsecured claim proof of which is tardily filed" (emphasis added)); § 1129(b)(2)(B)(i) (requiring, for a plan to be "fair and equitable," that each unsecured creditor "receive or retain

on account of such claim property of a value . . . equal to the *allowed* amount of such claim" (emphasis added)). Hertz's Plan therefore fits comfortably with the codified absolute priority rules that were violated in *Jevic* and on which that opinion was based.

For those two reasons, even assuming that *Jevic* announces a clear-statement rule, it does not apply to the facts here. Instead of a clear-statement rule, I would apply the Supreme Court's typical approach to harmonizing pre-Code practice with the Code's text, under which pre-Code practice "can be relevant to the interpretation of an ambiguous text" but is irrelevant if there is "no textual ambiguity." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012). Because the Code's disallowance of the Noteholders' claims is clear and unambiguous,[2] I would not use the common law absolute priority rule as an "extratextual supplement" to supplant § 502(b)(2). *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 10 (2000).

### III

In addition to their arguments regarding impairment and *Jevic*, my colleagues appeal more generally to policy. They argue that treating the Noteholders as unimpaired and allowing Hertz to pay them less than contract-rate interest would produce odd results. For example, they argue that the unimpaired Noteholders would be treated worse than impaired, dissenting creditors, insofar as the latter would be entitled to "fair and equitable" treatment that would include contract-rate interest. My

---

[2] Assuming that *Jevic*'s clear-statement rule applies here, it is satisfied because § 502(b)(2) disallows post-petition interest with "unmistakabl[e]" clarity. *Cohen v. de la Cruz*, 523 U.S. 213, 222 (1998).

colleagues may well be correct that "unimpaired creditors [will] be treated worse than impaired creditors" under Hertz's interpretation, but we are bound to "enforce[] the Code's express terms" regardless of such policy considerations. *PG&E*, 46 F.4th at 1075 (Ikuta, J., dissenting).

*      *      *

For these reasons, I respectfully concur in part and dissent in part.